UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11270-RGS

JEFFREY SEBELL

v.

RIVERSOURCE LIFE INSURANCE COMPANY,
f/k/a IDS LIFE INSURANCE CO., INC.

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER OF JUDGMENT
FOLLOWING A NONJURY TRIAL

August 30, 2012

STEARNS, D.J.

Based on the credible testimony and exhibits offered at trial, I make the following findings of fact.

1. Plaintiff Jeffrey Sebell was born in 1955. Joint Ex. (Ex.) 5, at 1. In 1973, he enrolled in Bowdoin College in Maine. Tr. vol. 1, at 57. In 1975, while a sophomore at Bowdoin, he sustained a severe head and brain injury in an automobile accident. Ex. 31. After three months of hospitalization and therapy, Sebell returned to Bowdoin as a full-time student, graduating in 1978 with a B.A. in economics. Tr. vol. 1, at 60-62. He is currently divorced and has two adult children who live independently. *Id.* at 109, 142.

2. After graduating from college, Sebell worked at a Colorado radio station as a disc jockey. He returned to Massachusetts in 1979 to join the family sheet metal fabrication business, MSM Industries, Inc. (MSM). His first job at MSM was as an expediter. *Id.* at 62-63.

3. Sebell remained with MSM, and over time, his responsibilities changed. In 1996, he was named Vice President of Sales and Marketing, a salaried position that he held until MSM went out of business in November of 2004. *Id.* at 113, 119, 132. While MSM was thriving, Sebell supervised four salespeople. *Id.* at 116-117. At some point in 2000, Sebell's job performance began to deteriorate. *Id.* at 24. Sebell's brother, William, who also worked at MSM, testified that the company began taking work away from Jeffrey that required any amount of attention to detail, memory, or sustained client contacts. *Id.* at 24-25. While previously Sebell had handled all of his sales calls by himself, William began accompanying him on customer calls, to ensure that sales were closed. *Id.* at 25. William also took over several important accounts entirely. *Id.* at 26. Among fellow employees, Sebell developed a reputation for impulsive, and at times, socially unacceptable behavior, often culminating in angry outbursts and inappropriate lapses of judgment. *Id.* at 120-124. By 2000, Sebell felt more comfortable working at home where there was less stimulation. *Id.* at 48.

4. In 1982, concerned that the head injury might be affecting his personality,

Sebell sought out a neuropsychological evaluation from Dr. Deborah Fein, a psychologist. Dr. Fein found Sebell to be a man of high intelligence, with excellent verbal skills, although he showed some subtle deficits and signs of immaturity. Dr. Fein noted that Sebell was "obviously very motivated to exploit his potential." Ex. 39.

5. In July of 1997, Jeffrey and William Sebell, on the advice of a family financial planner, applied to purchase disability income insurance policies from defendant Riversource Life Insurance Co., then known as IDS Life Insurance Co., Inc.[1] Tr. vol. 1, at 67. On the disability insurance application, in response to a question about preexisting medical conditions, Sebell wrote "auto accident 1975, loss of consciousness for 30 days." He also stated that he had suffered no recurrent problems as a result. Ex. 6.

7. The application was approved. Riversource Policy 9100-06031068 was issued effective September 15, 1997. Ex. 7.

8. The Riversource policy insured against the loss of income attributable to disability, both total and partial. The Policy defined total disability as:

**Total Disability**

In the first five years of a Period of Disability, Total Disability means

---

[1] Defendant is referred to throughout this decision as Riversource to avoid any confusion.

that because of Injury or Sickness, You are:

1. Unable to perform the material and substantial duties of Your Regular Occupation; and You are:

2. Under the regular and personal care of a licensed Physician other than Yourself. We will waive this requirement if We receive written proof acceptable to Us that further Physician's care would be of no benefit to you.

After five years of a Period of Disability, Total Disability means that because of Injury or Sickness, You are:

1. Unable to perform the material and substantial duties of Your Regular Occupation; and You are:

2. Not engaged in any other gainful occupation; and You are:

3. Under the regular and personal care of a licensed Physician other than Yourself. We will waive this requirement if We receive written proof acceptable to Us that further Physician's care would be of no benefit to You.

The policy also defined **Pre-Existing Conditions** as:

During the first year the policy is in force, We will not pay benefits for loss or Disability caused by a pre-existing condition if it was not disclosed on Your application. "Pre-existing" means: (1) the existence of symptoms that would cause an ordinarily prudent person to seek medical diagnosis, care or treatment within a one year period preceding the effective date of coverage; or (2) a condition for which medical advice or treatment was recommended by or received from a Physician with a one year period preceding the effective date of coverage.

Ex. 7, at 5-6.

9. In 2000, friction began to develop between Sebell and his wife and son. He

4

questioned whether his social awkwardness, inability to cope with the work environment at MSM, and feelings of stress were related to his head injury. In the fall of 2002, Sebell asked Dr. Mary MacNamee, a psychologist at the New England Rehabilitation Hospital in Woburn, MA, to conduct a neuropsychological evaluation. Tr. vol. 1, at 124-126.

10. Dr. MacNamee's notes explain that: "Mr. Sebell had expressed an interest in understanding more how a traumatic brain injury he sustained in 1975 might still be having an impact on his day to day functioning, especially in terms of interpersonal relationships and communication." Ex. 40. She concluded that:

> Mr. Sebell has retained some very excellent cognitive skills, but those areas that are currently in the average to low average range are thought to reflect left frontal as well as diffuse axonal injury sustained in his TBI in 1975. While his "impairments" are relatively mild compared to functioning of the general population, it is important to note that they are experienced as significant by Mr. Sebell who is used to functioning at a much higher level in many other areas. When one's attentional abilities are inconsistent, one can never rely on them being at their best, and one is left uncertain about one's functioning. When speed of processing is slow and organizational abilities are weak, communication is often impacted, leading to interpersonal difficulties such as those with which Mr. Sebell presented.

Ex. 40.

11. Dr. MacNamee referred Sebell to the Brigham Behavioral Neurology Group at the Brigham and Women's Hospital in Boston. He eventually presented to Dr. Diler

Acar, a neurologist, who prescribed a regime of Effexor, an anti-depressant. She also arranged for a follow up evaluation with Dr. MacNamee. Ex. 41. In her 2004 evaluation, Dr. MacNamee wrote that Sebell had

> demonstrated improved scores on some tests in the current evaluation compared to the 2002 neuropsychological evaluation. He also demonstrated a decline in scores in some other tests. Most affected scores are related to working memory and other aspects of attention . . . the differences in test scores reflect the variability in attention that is a hallmark of attentional difficulties.

*Id.*

12. After MSM closed its doors in November of 2004, Sebell worked briefly (and unsuccessfully) as a mortgage broker. Tr. vol. 1, at 84. In July of 2005, Sebell took and passed the state insurance licensing examination. For the next three months, he attempted to establish himself as a commissioned insurance salesman with the National Association for the Self-Employed (NASE). *Id.* at 86. After failing to sell a single policy, Sebell took a job as a scheduler for Carolyn Fox, a very successful broker at NASE. *Id.* at 88. Sebell lost this job after two months when he was found to have violated company rules. *Id.* at 88-89. This was Sebell's last paying job.

13. On January 25, 2006, Sebell saw Dr. Acar and complained of an increased loss of focus. Dr. Acar doubled Sebell's prescribed dose of Effexor. Dr. Acar noted in a letter to Dr. Lawrence Epstein, Sebell's personal physician:

> I saw Mr. Sebell for a followup evaluation today. He is a 50-year-old man whom I followed with persistent cognitive difficulties due to his traumatic brain injury. His difficulties became much more obvious to him approximately 2 years ago. . . . He had a neuropsychological evaluation in year 2000, at which time, he was noted to have persistent difficulties on attention and working memory. I suggested that we repeat a neuropsychological evaluation mainly to look at his weaknesses and strengths from a different perspective this time, as he is very much starting to look for a new job. I believe that he was under the very protective care of his family business for all these years and his difficulties that he reports right now that has [sic] always been there with him.

Ex. 37.

14. In February of 2006, Sebell and his wife began divorce proceedings. He sought help in coping with his dysfunctional family, and began counseling at Brigham & Women's Hospital with Stacey Schamber, a social worker. Ex. 38.

15. Also in February of 2006, after a referral by Dr. Acar, Sebell underwent a third neuropsychological evaluation by Dr. Meghan Searl, a psychologist practicing with the Brigham Behavioral Neurology Group. Ex. 42.

16. Dr. Searl reported that "the impetus for this evaluation has to do with whether [Sebell] should continue to pursue employment or apply for disability . . . he has been let go twice from jobs over the last six months and is concerned about this." She further stated that: "The purpose of this evaluation is to clarify the nature of his current cognitive symptoms and to address the question of whether he should continue

to pursue jobs, what sorts of supports he might need on the job, and whether disability is a more reasonable option for him." Ex. 42, at 1.

17. In her "Impressions," Dr. Searl recorded:

> On formal testing his deficits are extremely subtle, but it seems clear that in day-to-day life he struggles to perform to his intellectual potential. He has the intellectual knowledge required to make reasonable decisions. . . . However, it seems the disconnect lies in his ability to put this knowledge into practice in the appropriate circumstances in real time.

*Id.* at 3.

18. Dr. Searl referred Sebell to Betsy Cohen, a vocational rehabilitation specialist at Advanced Rehab Solutions. She in turn referred Sebell for therapy at Community Rehab Care. He was discharged in September of 2006, after showing "significant improvements." Ex. 30, Discharge Summ. at 2. The discharge assessment summarized:

> At the time of his initial evaluation, Jeff demonstrated reduced problem solving, reasoning, executive functioning and pragmatics. These impairments significantly impacted his ability to maintain employment. Jeff is currently able to utilize organizational strategies (i.e. time planner, to do list, prioritizing strategies, etc.) and mnemonic devices to recall appropriate social guidelines (reducing inappropriate comments/jokes – ABLE) with distant supervision. . . . Jeff will continue to benefit from general guidance for prioritizing and maintaining his schedule as well as for processing social interactions (i.e. reviewing his discharge binder).

*Id.*

19. In a report dated March 9, 2006, Dr. Acar noted that:

8

> Since I saw him [Sebell], he has had a repeat neuropsychological evaluation with Dr. Searl. His Neuropsychological assessment showed problems with complex attention and on verbal warning, but it was included that his weakness was very much within the realm of judgment, insight, and problem solving. It was noted that he has intellectual knowledge required to make reasonable decisions, but that he seemed to be somewhat unable to put this knowledge in real life practices. He has seen Betsy Cohen, a rehabilitation specialist, who concluded that he is eligible for long-term disability looking at his difficulties realistically.

Ex. 37.

20. On August 29, 2006, Sebell filed an "Insured's Initial Claim for Disability" with Riversource. Ex. 12. On the claim form, in answer to the question: "Date of accident or date that you first noticed symptoms," Sebell wrote, "August 1975." There was also a supporting letter from Dr. Acar attached to the claim form stating in part that "[w]hen Mr. Sebell was 19 he was involved in a car accident, suffering an extremely serious closed head injury." *Id*.

21. On September 21, 2006, Lisa Weber, a Senior Claim Analyst at Riversource wrote to Sebell stating that: "We are happy to inform you that your Disability Income claim has been approved." Weber also related that based on Dr. Acar's letter, she had found that Sebell met the policy definition of total disability as of February 1, 2006. Ex. 13. Riversource began paying Sebell disability benefits.

22. On March 25, 2008, Ellen Rogers, then Sebell's attorney, wrote to Weber asking "that a determination be made that Mr. Sebell was totally disabled and unable

to work as of November 9, 2004, and that he receive retroactive disability benefits for the time period of November 9, 2004 through February 2006." Ex. 18. She enclosed a statement of support from Dr. Acar. Ex. 19. Weber thought the request for a redetermination of the date of disability unusual and undertook to further investigate the claim. Tr. vol. 1, at 188.

23. In October of 2008, Sebell applied for Social Security Disability Income (SSDI) benefits. In connection with the SSDI application, Sebell was examined by Dr. Roger Ginn of the Maine Disability Determination Services on February 2, 2009. In his report, Dr. Ginn concluded:

> It would generally appear that he [Sebell] has some mild, if not moderate, short-term memory difficulties. He also would appear to have some mild problems with impulsiveness and probably greater problems with organizational skills, most likely the result of his past head injury . . . . He likely has some cognitive deficits. He is not going to be able to do jobs that are highly complex or require much multitasking.

Ex. 43.

24. With the SSDI application, Sebell submitted a June 30, 2010, letter from Stacey Schamber, stating:

> Mr. Sebell suffers from a traumatic brain injury and has been unable to work due to the complex neuropsychiatric sequelae of his injury including fatigue, difficulty with attention, overstimulation, judgment and problem solving. According to his recent neuropsychological evaluation, Mr. Sebell has suffered declines in the realms of attention, executive functioning, and memory.

Ex. 38.

25. In April of 2010, in connection with his SSDI claim, Sebell underwent a second evaluation by Dr. Searl. Ex. 44. In her report, Dr. Searl stated:

> He [Sebell] exhibits mild declines in some areas of attention . . . . While his cognitive exam is largely stable, he is demonstrating some slight declines in frontal executive functions that could be related to a combination of the remote injury with the effects of normal aging. These findings could also be in part related to mild depression. Overall I am quite concerned about his inability to find work. He has been trying to support himself financially in multiple different ways, ranging from borrowing money from friends to moving out of his house in order to rent it. It is very possible that his deficits in attention, executive functioning, and memory are enough to keep him from supporting himself with paid work, particularly in this difficult economy. I support his pursuit of disability income.

Ex. 44.

26. After two denials of his claim, on August 27, 2010, Sebell was awarded SSDI benefits by Administrative Law Judge (ALJ) Joseph Shortill following a hearing. Pl.'s Ex. D. The ALJ relied on Dr. Searl's 2010 neurological evaluation of Sebell, Dr. Acar's reports, and Sebell's testimony in concluding that Sebell is disabled. Notice of Decision, August 27, 2010, 4-5. Finding him incapable of performing any past relevant work, the ALJ stated that

> despite indications within the record that demonstrate a long and stable work history . . . further investigation reveals that his job was performed in its entirety at the claimant's family business, where he was provided with accommodations as a concession to the residuals from his TBI, and

that he was unable to perform this work as generally performed outside the protected environment after the family business closed.

*Id.* at 5.

27. On June 9, 2009, Weber wrote to Rogers, confirming receipt of Sebell's treatment records, including the various neuropsychological evaluations. Ex. 14. In the same letter, Weber requested copies of Sebell's state and federal tax returns. *Id.* Weber referred the records to a neuropsychologist employed by Riversource for review. Tr. vol. 1, at 190.

28. Based on the report of the Riversource's neuropsychologist, Weber wrote to Sebell on September 11, 2009, disallowing his claim. "Our review of the information obtained does not support that you were totally disabled in 2004 or anytime thereafter under the terms of your insurance contract. There is no evidence within the medical or neuropsychological records to support cognitive changes occurrent at the time your family business closed in 2004." Weber then continued: "Since your initial prognosis of traumatic brain injury in 1975, you have demonstrated the cognitive capability to graduate from college, participate in a MBA Program as well as maintain gainful employment for more than twenty years. As a result of our findings, we must respectfully deny your claim for additional benefits." Ex.15.

29. Sebell filed this lawsuit on June 22, 2010.

30. On May 24, 2011, as part of discovery, Sebell underwent a neurosychological evaluation conducted by Dr. Nancy Hebben, a psychiatrist retained by Riversource with a specialty in brain injuries. From the neuropsychological tests conducted in 1982, 2002, and 2004, Dr. Hebben determined that Sebell has very high to superior cognitive functioning ability. She also concluded that the medical records did not corroborate any progressive decline in Sebell's cognitive functioning since the 1975 head injury. Ex. 29. At trial, Dr. Hebben testified that during her examination, Sebell "wasn't giving his best effort" on her tests. Tr. vol. 2, at 22. Sebell admitted that he deliberately underperformed because of an "adversarial thing in [his] head." Tr. vol. 1, at 98.

31. Sebell now lives in Bowdoinham, Maine. Since his divorce, he has entered into a steady relationship with a girl friend in whose home he now lives. He maintains a moderately active social life, going out "two or three nights per week," working out regularly, and doing household chores. Tr. vol. 1, at 169-171. He has not engaged in any gainful occupation since moving to Maine. He remains under the care of Dr. Acar.

## RULINGS OF LAW

1. The insured bears the initial burden of proving that the loss is within the description of the risks covered and outside a limiting exception. *Tumblin v. Am. Ins. Co.*, 344 Mass. 318, 320 (1962); *St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing*

*Corp.*, 26 F.3d 1195, 1200 (1st Cir. 1994). Disability coverage is no exception. *Arabia v. John Hancock Mut. Life Ins. Co.*, 301 Mass. 397, 402 (1938).

2. In the law of insurance waiver does not operate to broaden coverage to include a risk not within the terms of the policy, nor can it operate to waive the limits of coverage stated in the policy. *Merrimack Mut. Fire Ins. Co. v. Nonaka*, 414 Mass. 187, 191 (1993).

3. An insurance contract is to be interpreted "according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed." *MacArthur v. Mass. Hosp. Serv., Inc.*, 343 Mass. 670, 672 (1962) (citations omitted). When an insurer chooses policy language that admits of two equally rational interpretations, a court must choose the alternative that favors the insured. *Hazen Paper Co. v. United States Fid. & Guar. Co.*, 407 Mass. 689, 700 (1990). The preferred approach is "to inquire what the simplified, conversational language of the policy would mean to a reader applying normal reasoning or analysis." *Nelson v. Cambridge Mut. Fire Ins. Co.*, 30 Mass. App. Ct. 671, 673 (1991), quoting *Commerce Ins. Co. v. Koch*, 25 Mass. App. Ct. 383, 384 (1988).

4. In the disability context, a court will ordinarily (although it is not required to) give "more weight" to treating physicians' opinions than it will to interested reviewers, "since these sources are likely to be the medical professionals most able to provide a

detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). *Cf. Arroyo v. Sec'y of HHS*, 932 F.2d 82, 89 (1st Cir. 1991) (deference is not required if the medical record contradicts a treating physician's opinion).

5. A disability insurer is not bound by a determination by the Social Security Administration that an insured is disabled, "except perhaps in the rare case in which the statutory criteria are identical to the criteria set forth in the insurance plan." *Pari-Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir. 2000). Here the stated criteria for an SSDI determination of disability are not so substantially different than those used by the Riversource Policy as to justify a disregard of the SSA determination that Sebell is totally disabled. The language in the "Definitions" section of the Policy defines "Total Disability" as meaning "that because of Injury or Sickness: [You are] 1. Unable to perform the material and substantial duties of Your Regular Occupation; and You are: 2. Not engaged in any other gainful occupation; and You are: 3. Under the regular and personal care of a licensed Physician other than Yourself." The Social Security Act (42 U.S.C. § 423(d)(2)(A)) defines "disability" as "physical or mental impairment or impairments . . . of such severity that [one] is not

only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." If anything, the SSA definition is more restrictive as it requires evidence that a claimant can perform no equivalent work available in the national economy, while the Policy requires only that the insured demonstrate an inability to perform his last or regular occupation.

ULTIMATE CONCLUSIONS OF FACT AND LAW

1. At all relevant times, Riversource Policy 9100-06031068 issued to Jeffrey Sebell in 1997 was in full force and effect. That Sebell suffered from a preexisting condition (as defined in the Policy) was fully disclosed to Riversource when Sebell applied for disability insurance and was known to Riversource when it issued the Policy.

2. Jeffrey Sebell, the insured, is totally disabled as defined in the Policy.

3. Sebell's "Regular Occupation," as defined in the Policy as "the one from which You derive the majority of Your earned income at the time You are Disabled," was that of a marketing and sales executive and not, as Riversource contends, a telemarketer. There is no evidence that Sebell in fact worked as a telemarketer, while there is ample evidence that Sebell became disabled while working at MSM, and remained disabled during the time in 2006 that he worked as an insurance salesman

and as a scheduler for Carolyn Fox.

4. Sebell's disability is directly related to the trauma caused by the closed head injury that he suffered in the 1975 automobile accident, the long term effects of which have manifested themselves over time in the form of a progressive deterioration in Sebell's cognitive functioning ability. I base this finding on: (a) Dr. Fein's baseline examination in 1982 and the two neuropsychological evaluations performed by Dr. MacNamee in 2002 and 2004; (b) Dr. McNameee's observation of a decline in Sebell's memory skills and his ability to maintain focus; (c) Dr. Searl's observation of a further decline in Sebell's executive functioning capacity during her examination in 2010; (d) the opinion of Dr. Acar, Sebell's treating neurologist, that Sebell's "persistent cognitive difficulties" were attributable to his closed head injury and had worsened over time; (e) the opinions of Dr. Acar, Dr. Searl, and Dr. Ginn that Sebell was no longer capable of performing a job with complex demands; (f) the opinion of Betsy Cohen, the rehabilitation specialist, that Sebell is disabled and incapable of maintaining gainful employment; and (g) the finding of ALJ Shortill that Sebell was disabled within the meaning of the Social Security Act.

5. The statement in Lisa Weber's September 11, 2009 letter reversing the decision to award Sebell benefits, that "[t]here is no evidence within the medical or neuropsychological records to support cognitive changes occurrent at the time your

17

family business closed in 2004," is factually erroneous.

6. While I have considered Dr. Hebben's testimony carefully and believe that she is well qualified in the field of neuropsychology, I have not given her opinion the same weight that I have given to the opinions of the other medical specialists. The reasons are as follows: (a) Dr. Hebben largely focused her inquiry on the issue of whether there had been a decline in Sebell's cognitive functioning during the period 2006 to 2010, that is, in the interval between Dr. Searl's two evaluations, Tr. vol 2, at 7, 16-17; (b) I do not believe that she gave sufficient weight to the full longitudinal history and in particular to the progressive deterioration observed in Sebell's personality and job performance while he worked at MSM;[2] (c) although Dr. Hebber gave a comprehensive battery of tests to Sebell over the course of an entire day, she was irritated by her (correct) perception that he was deliberately underperforming, *id.* at 22-23, and this may have influenced her opinion that despite "this lesser effort, he was doing very well cognitively," *id.* at 24; and (d) she acknowledged in her testimony that there was no indication that Sebell had exaggerated his symptoms in presenting to the various specialists who had examined and treated him over the years, and that

---

[2] Although in her ultimate opinion, Dr. Hebben testified that there had been no significant change in Sebell's cognitive functioning since 1982, *id.* at 31, this contradicted what she said several times earlier about the focus of the inquiry she had been asked to make.

18

his symptoms might easily be attributable to the 1975 brain injury.  *Id*. at 42.

7.  By initially approving Sebell's claim for disability benefits, Riversource (as it argues) did not waive any terms or conditions of the Policy, nor was it estopped from later reversing its position with respect to the award of benefits because of the benefit payments it had made in the interim.  Nevertheless, because Sebell was in full compliance with the terms of the Policy regarding preexisting conditions neither doctrine is relevant to his case in any event.

ORDER

For the foregoing reasons, the court finds for Sebell on Count I of his Complaint.  As the prevailing party, Sebell will, within fourteen (14) days of the date of this decision, submit a Proposed Final Order of Judgment for the court's approval.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE